**UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

|  |  |
|---|---|
| **KEVIN ANDERSON**,<br><br>                    Plaintiff,<br><br>          v.<br><br>**BDO USA, P.C.**,<br><br>                    Defendant. | Case No. 25-cv-1002 (CRC) |

### FINDINGS OF FACT AND CONCLUSIONS OF LAW

Plaintiff Kevin Anderson was a partner of Defendant BDO USA, P.C. ("BDO"), an accounting, tax, and consulting firm.  As a partner, Anderson was entitled to an "annual retirement benefit," in the form of a recurring monthly payment, for the rest of his life.  Under Anderson's partnership agreement, those payments would "begin" after he experienced a "separation of service."  Anderson retired from the partnership in June 2019, but he agreed to continue working for BDO as a salaried employee.  The terms of Anderson's retirement agreement reiterated that he would "start" receiving retirement benefits "commencing" in the month after his separation from BDO.  Anderson left the firm in December 2023, and BDO started paying him retirement benefits the following month.

But Anderson says that BDO underpaid.  Specifically, he claims he was entitled to retirement benefit payments between June 2019 (when he retired from the partnership) and December 2023 (when he left the firm).  In his view, those 54 monthly payments were "deferred" and should have been paid to him in a "lump sum" immediately after his separation from BDO.  So Anderson filed this lawsuit, seeking to recover those unpaid benefits under the Employee Retirement Income Security Act of 1974 ("ERISA").  Because this case turns only on questions of law, the parties have cross-moved for judgment under Federal Rule of Civil

Procedure 52.  For the reasons explained below, the Court will deny Anderson's motion for judgment and grant BDO's cross-motion.

## I.    Legal Standard

This case is before the Court as a "trial on the papers" under Federal Rule of Civil Procedure 52.  See July 28, 2025 Min. Order; Mobley v. Cont'l Cas. Co., 405 F. Supp. 2d 42, 47 (D.D.C. 2005) ("In essence, Rule 52 authorizes a bench trial based on the evidence submitted by the parties to the Court.").  Because the case is being "tried on the facts without a jury," the Court "must find the facts specially and state its conclusions of law separately."  Fed. R. Civ. P. 52(a); see Ascom Hasler Mailing Sys., Inc. v. U.S. Postal Serv., 885 F. Supp. 2d 156, 164 (D.D.C. 2012).  The Court's factual findings "must be 'sufficient to indicate the factual basis for the ultimate conclusion.'"  Ramirez v. U.S. Immigr. & Customs Enf't, 471 F. Supp. 3d 88, 97 (D.D.C. 2020) (quoting Kelley v. Everglades Drainage Dist., 319 U.S. 415, 422 (1943)).  However, the Court "need only make brief, definite, pertinent findings and conclusions upon the contested matters; there is no necessity for over-elaboration of detail or particularization of facts."  Id. (quoting Fed. R. Civ. P. 52(a) advisory committee's note to 1946 amendment).  Put another way, the Court "need not address every factual contention and argumentative detail raised by the parties, [n]or discuss all evidence presented[.]"  Yah Kai World Wide Enters., Inc. v. Napper, 292 F. Supp. 3d 337, 344 (D.D.C. 2018) (first alteration in original) (quoting Moore v. Hartman, 102 F. Supp. 3d 35, 65 (D.D.C. 2015)).  The Court's findings of fact and conclusions of law "may be incorporated in any opinion or memorandum of decision[.]"  Moore, 102 F. Supp. 3d at 64 (quoting Defs. of Wildlife, Inc. v. Endangered Species Sci. Auth., 659 F.2d 168, 176 (D.C. Cir. 1981)).

## II.    Findings of Fact

Anderson was admitted as a partner of BDO's predecessor—then organized as a limited liability partnership—in February 2007.  See BDO73.[1]  When Anderson joined the firm, his benefits were governed by a partnership agreement.[2]  See id.  The partnership agreement provided that a partner could only receive retirement benefits if he or she had fifteen years of service as a partner at the firm.  See Pl.'s Mot. for J. Pursuant to Fed. R. Civ. P. 52 ("Pl.'s Mot.") at 6 n.1; Def.'s Cross-Mot. for J. Pursuant to Fed. R. Civ. P. 52 ("Def.'s Mot.") at 3.  It would not have been possible for Anderson to have fifteen years of service as a partner before he turned 62 years old.  See BDO3.  So Anderson and BDO entered into a supplemental agreement that, among other things, detailed his eligibility for retirement benefits.  See BDO73–77 ("First Supplemental Agreement").  The First Supplemental Agreement provided that if Anderson stayed at the firm until he turned 62 years old, he would receive 30 percent of the retirement benefits that a partner with fifteen years of service would ordinarily receive at that age.  See BDO74.

A few months after Anderson joined BDO, the firm moved to a two-tier partnership structure.  See BDO27–28.  Under this new model, partners were either variable share partners or fixed share partners.  See id.  Anderson was a variable share partner until June 2016, when he reached the mandatory retirement age of 62 years old.  See BDO42; BDO78.  He then converted to a fixed share partner.  See BDO78. Anderson and BDO memorialized this transition in a

---

[1] The Court uses the record citations provided by the parties and designated by the Administrative Record.  The Administrative Record is attached to Anderson's Motion for Judgment.  See Pl.'s Mot. for J. Pursuant to Fed. R. Civ. P. 52, Ex. 1.

[2] The partnership agreement that was in effect when Anderson joined BDO does not appear in the Administrative Record.  See Def.'s Cross-Mot. for J. Pursuant to Fed. R. Civ. P. 52 at 3.

second supplemental agreement.  See BDO78–79 ("Second Supplemental Agreement").  The Second Supplemental Agreement provided that if Anderson remained a fixed share partner until he turned 65 years old, he would receive 50 percent of the retirement benefits that a partner with fifteen years of service by that age would ordinarily receive under the firm's partnership agreement.  See BDO78.

In November 2017, BDO amended and restated its partnership agreement.  See BDO27–72 ("Partnership Agreement").  Article VII of the Partnership Agreement details the retirement benefits that BDO offers to its partners.  See BDO42–47.  As relevant here, eligible partners are entitled to an "annual retirement benefit."  BDO42.  The annual retirement benefit is "based upon the retired Partner's average annual earnings from the Partnership during those three (3) fiscal years in which he/she was a Variable Share Partner which yield the highest average amount, after applicable adjustments[.]"[3]  Id.  The partner's adjusted average annual earnings form the basis of his or her annual retirement benefit:  A partner receives 30 percent of those earnings for the first five years of retirement, then 20 percent of those earnings thereafter.  See BDO44.  The annual retirement benefit is paid in "equal monthly amounts" and subject to an inflation adjustment.  See BDO46–47.

The parties' dispute largely turns on Section 7.9(a) of the Partnership Agreement.  It reads:

> Payment of the annual retirement benefits provided under this Article VII for a Partner who retires in accordance with the provisions of Section 7.1, Section 7.2, or Section 7.5(a), and who has attained the age of at least fifty-five (55) years as a

---

[3] If a variable share partner retired after more than fifteen but fewer than 20 years of service with the partnership, the partner's average annual earnings were decreased by a certain percentage.  See BDO43.  For example, if a variable share partner retired after sixteen years of service with the partnership, the partner's average annual earnings were multiplied by 80 percent (16 divided by 20).  If the variable share partner retired after eighteen years of service, the average annual earnings were multiplied by 90 percent (18 divided by 20).

> Variable Share Partner before or at retirement shall be made to a retired eligible Partner during his/her lifetime but in any event for a minimum period of ten (10) years following his/her retirement date, provided that, payment of such retirement benefits shall not begin until the Partner experiences a separation from service within the meaning of Section 409A of the Internal Revenue Code, as amended[.]

BDO45.  Section 409A of the Internal Revenue Code ("Section 409A") imposes significant penalties on taxpayers who receive compensation from a "nonqualified deferred compensation plan" that does not meet certain requirements.  See 26 U.S.C. § 409A.  One of those requirements is that the deferred compensation "may not be distributed earlier than" the employee's "separation from service."  Id. § 409A(a)(2)(A)(i).  An employee experiences a "separation from service" from an employer "if the employee dies, retires, or otherwise has a termination of employment with the employer."  26 C.F.R. § 1.409A-1(h)(1)(i).

Article XVI of the Partnership Agreement, titled "Execution and Amendment," also references Section 409A.  Specifically, Section 16.10 provides:

> This Agreement shall be interpreted to comply with, and to avoid adverse tax consequences under, Section 409A.  If any payment or benefit cannot be provided or made at the time specified herein without incurring penalty sanctions or adverse tax consequences under Section 409A, then such benefit or payment shall be provided in full at the earliest time thereafter when such adverse tax consequences will not be imposed.  Further, for purposes of applying the rules under section 409A regarding permissible time of payment, the designated time for each payment under Articles VII, VIII and IX shall be the calendar year of such scheduled payment.

BDO71.  As explained below, Anderson contends that Section 16.10 "contains further clarification regarding the potential application of Section 409A" to a partner's retirement benefits.  Pl.'s Mot. at 5.  BDO describes Section 16.10 as a "general catch-all provision" for the entire Partnership Agreement that was included "to avoid any negative tax consequences to partners and retired partners[.]"  Def.'s Mot. at 5.

Anderson reached the mandatory retirement age for fixed share partners when he turned 65 years old.  See BDO42; BDO82.  Immediately after retiring from the partnership in June

5

2019, Anderson continued work for the firm as a full-time managing director.  See BDO82–83.

The terms of his employment, including his annual salary, are memorialized in a June 2019

agreement.  See BDO82–85 ("Retirement Agreement").  The Retirement Agreement includes a

provision about Anderson's retirement benefits:

> You will receive retirement benefits in accordance with the Partnership Agreement
> and your Second Supplemental Agreement.  You will start receiving retirement
> benefits commencing on or about the 15th of the month following your separation
> from the Firm as an employee.

BDO83.

The Retirement Agreement also addresses two separate accounts from Anderson's time

as a partner: his cash capital account and his undistributed earnings account.  See BDO82.  First,

BDO would distribute the balance of Anderson's cash capital account in 60 monthly installments

beginning in July 2019.  See id.  Second, Anderson waived his interest in his undistributed

earning account, and he would receive an "additional retirement benefit" equal to the account

balance in 120 monthly installments.  See BDO58–59; BDO82–83.

The Retirement Agreement "supersedes any and all previous agreements of any kind

whatsoever" between Anderson and BDO, except for the Partnership Agreement, the

Supplemental Agreement, and the Second Supplemental Agreement.  BDO84.  If there is any

conflict between the Retirement Agreement and the prior agreements, the terms of the

Retirement Agreement govern.  See id.

In July 2023, BDO converted from a partnership to a professional corporation.  See

BDO17.  The firm then adopted the "BDO USA, LLP Partnership Agreement Article VII, VIII,

and IX Plan."  See BDO17–26 (the "Plan").  The Plan covers "individuals who retired . . . on or

before June 30, 2023" and were either "receiving benefits under Article VII, VIII, or IX of the

Partnership Agreement" or "eligible to receive benefits under Article VII of the Partnership

Agreement at a later date[.]"  BDO17.  The Plan specifies that a covered individual's annual retirement benefit "shall be calculated in accordance with the terms of the Controlling Agreement."  BDO19.  The "Controlling Agreement" refers to "the Partnership Agreement, including but not limited to Article VII of the Partnership Agreement, in effect at the time of the [individual's] retirement from the Partnership and any supplemental agreement and/or retirement agreement between [the individual] and the Partnership, as applicable."  BDO18.  In other words, the Plan incorporates the Partnership Agreement, the Supplemental Agreement, the Second Supplemental Agreement, and the Retirement Agreement.

Anderson worked for BDO as a salaried employee until December 2023.  See BDO2; BDO86.  The following month, he received the first payment of his annual retirement benefit and the additional retirement benefit derived from his undistributed earnings account.  See BDO89; BDO95.  That payment did not include a "lump sum" of annual retirement benefit payments for the 54 months while he was a salaried employee.  See BDO95.  Nor did it include a "deferred" payment of his additional retirement benefit.  See id.

In March 2024, Anderson's counsel sent a letter to BDO's deputy general counsel.  See BDO1–6.  The letter stated that BDO had incorrectly "taken the position that [he] forfeited 54 monthly retirement payments by continuing to work for BDO."  BDO3.  Those retirement benefits, counsel asserted, were not forfeited but rather "deferred" between July 2019 and December 2023.  Id.  Accordingly, the letter stated that BDO owed Anderson "approximately $262,000 in retirement benefits[.]"  BDO3.

BDO treated Anderson's letter as an "initial claim for benefits under the Plan."  BDO86.  In September 2024, BDO's Plan Committee denied his "claims requesting reconsideration of his benefit commencement date and benefit calculation," id., stating that his "time as a Managing

Director subsequent to his retirement does not count towards retirement benefit accrual," BDO88.  Anderson appealed the Plan Committee's decision, reiterating his position that he "earned 54 months of retirement benefits and undistributed earnings, which should have been paid upon his separation of service from BDO[.]"  BDO92.  The Plan Committee denied his appeal in January 2025.  See BDO112–15.  BDO also confirmed that Anderson had "exhausted the claims and appeals procedures provided for under the Plan."  BDO115.  Anderson timely filed this lawsuit in April 2025.  See Am. Compl. ¶ 18.

### III.  Conclusions of Law

As evidenced by the parties' cross-motions for judgment, the issue before the Court is relatively narrow.  The parties agree that Anderson is entitled to retirement benefits under the Partnership Agreement.  They further agree that he experienced a "separation from service" from BDO in December 2023, so the firm had no obligation to remit payment of his retirement benefits until January 2024.  The only dispute is whether BDO owed Anderson a "lump sum" of retirement benefits—including the annual retirement benefit and the additional retirement benefit—that purportedly "accrued" during the 54 months he worked as a full-time salaried employee following his retirement from the partnership in June 2019.

### A.  Claims for Benefits Under ERISA

Anderson seeks to recover retirement benefits that are purportedly due to him under the Plan.  See id. ¶¶ 70–81.  The parties do not dispute that the Plan is an "employee benefit plan" governed by ERISA.  29 U.S.C. § 1002; see Pl.'s Mot. at 13; Def.'s Mot. at 13–14.  ERISA provides that a participant of a covered benefits plan may file a lawsuit "to recover benefits due to him under the terms of his plan, to enforce his rights under the terms of the plan, or to clarify his rights to future benefits under the terms of the plan."  29 U.S.C. § 1132(a)(1)(B); see Aetna

Health Inc. v. Davila, 542 U.S. 200, 210 (2004) ("If a participant or beneficiary believes that benefits promised to him under the terms of the plan are not provided, he can bring suit seeking provision of those benefits."). The Court reviews BDO's denial of benefits "under a *de novo* standard unless the benefit plan gives the administrator or fiduciary discretionary authority to determine eligibility for benefits or to construe the terms of the plan." Firestone Tire & Rubber Co. v. Bruch, 489 U.S. 101, 115 (1989). The parties agree that the *de novo* standard applies here. See Joint Notice (ECF No. 11) ¶ 1.

The Supreme Court has "recognized the particular importance of enforcing plan terms as written in [§ 1132(a)(1)(B)] claims." Heimeshoff v. Hartford Life & Acc. Ins. Co., 571 U.S. 99, 108 (2013) (collecting cases). Courts interpret ERISA plans using "[o]rdinary principles of contract interpretation." US Airways, Inc. v. McCutchen, 569 U.S. 88, 102 (2013); see Foster v. Sedgwick Claims Mgmt. Servs., Inc., 842 F.3d 721, 734 (D.C. Cir. 2016) (collecting cases). "Courts construe ERISA plans, as they do other contracts, by 'looking to the terms of the plan' as well as to 'other manifestations of the parties' intent.'" US Airways, 569 U.S. at 102 (quoting Firestone, 489 U.S. at 113). Accordingly, the Court must interpret the Plan in light of the Partnership Agreement, the Supplemental Agreement, the Second Supplemental Agreement, and the Retirement Agreement. See Anthony v. Int'l Ass'n of Machinists & Aerospace Workers Dist. Lodge 1, 378 F. Supp. 3d 30, 39 (D.D.C. 2019) (noting that it is "necessary to look outside of the Plan to interpret its terms" when it "specifically references a separate written agreement"), aff'd, No. 20-7036, 2021 WL 4056297 (D.C. Cir. Sept. 3, 2021).[4]

---

[4] The parties agree that the terms of the Partnership Agreement govern Anderson's claim for retirement benefits. See Pl.'s Mot. at 3; Def.'s Mot. at 4.

While the Plan includes a Delaware choice-of-law provision, see BDO24, Anderson submits that the Court should interpret the Plan pursuant to federal common law, Pl.'s Mot. at 12.  BDO does not dispute that federal common law applies to Anderson's § 1132(a)(1)(B) claim.  See Franchise Tax Bd. of State of Cal. v. Constr. Laborers Vacation Tr. for S. Cal., 463 U.S. 1, 20 n.20 (1983) ("[F]ederal jurisdiction over suits under [§ 1132] is exclusive, and they are governed entirely by federal common law."); Serv. Emps. Int'l Union Nat'l Indus. Pension Fund v. Bristol Manor Healthcare Ctr., Inc., 153 F. Supp. 3d 363, 372 n.10 (D.D.C. 2016) (recognizing that federal common law "governs the interpretation of ERISA plans").  But since the parties' dispute "turns on general contract principles that equally apply under [Delaware] and federal common law, the Court finds that it would reach the same conclusion irrespective of which law governs."  Stanley v. George Washington Univ., 394 F. Supp. 3d 97, 107 n.7 (D.D.C. 2019) ("The relevant federal substantive law includes common-sense canons of contract interpretation that are derived from state law." (citation and internal quotation marks omitted)), aff'd, 801 F. App'x 792 (D.C. Cir. 2020).

B.  Section 7.9(a) of the Partnership Agreement

Whether Anderson's retirement benefits "accrued" while he was a salaried employee turns on Section 7.9(a) of the Partnership Agreement.  As noted above, Section 7.9(a) states:

> Payment of the annual retirement benefits provided under this Article VII . . . shall be made to a retired eligible Partner during his/her lifetime but in any event for a minimum period of ten (10) years following his/her retirement date, provided that, payment of such retirement benefits shall not begin until the Partner experiences a separation from service within the meaning of Section 409A[.]

BDO45.  The parties agree that Anderson experienced a "separation from service" in December 2023, but they disagree about how to interpret the remainder of the section.

Anderson submits that BDO owed him retirement benefits immediately "following [his] retirement date" in June 2019.  Pl.'s Mot. at 19 (quoting BDO45).  But to avoid adverse tax

10

consequences under Section 409A, the "payment of such retirement benefits" could not "begin," in his view, until he experienced a separation from service.  BDO45.  In other words, Section 7.9(a) purportedly "defer[s] the commencement date" for the payment of retirement benefits that BDO owed him between July 2019 and December 2023.  Pl.'s Mot. at 18.

BDO counters that the Partnership Agreement makes no mention of a "lump sum" or "accrual" of retirement benefits prior to a partner's separation from service.  Def.'s Mot. at 16.  Instead, Section 7.9(a) only provides for the "prospective payment" of the annual retirement benefit, which "commenc[es] upon a separation from service."  Id. ("Nothing in [Section 7.9(a)] states, or even suggests, that . . . a partner is entitled to an *additional* lump sum payment for periods prior to such separation.").  The firm locates support for this reading in the Retirement Agreement, which states that Anderson would "start receiving retirement benefits" after his "separation" from the firm.  BDO83.  While BDO's reading is "premised on the 'ordinary and usual meaning' of the Partnership Agreement," the firm says, "there is no basis for interpreting Section 7.9(a) to require the payment [Anderson] seeks."  Def.'s Mot. at 16–17.

BDO has the better of the argument.  Before turning to Section 7.9(a), the Court first considers the Retirement Agreement, as its terms govern "if there is any conflict" with the Partnership Agreement.  BDO84; see also Pl.'s Mot. at 8.  The Retirement Agreement provides that Anderson would "*start receiving* retirement benefits *commencing* on or about the 15th of the month following [his] separation from [BDO] as an employee."  BDO83 (emphasis added).  It does not say that his retirement benefits would "accrue" during his tenure as an employee, nor does it mention a "lump sum" payment in the first month following his separation from service.  Standing on its own, the Retirement Agreement confirms that Anderson would *begin* receiving retirement benefits—not ongoing retirement benefits plus 54 months of "accrued" benefits—

11

after he left BDO in December 2023.  See, e.g., Connors v. Conn. Gen. Life Ins. Co., 272 F.3d 127, 137 (2d Cir. 2001) ("On *de novo* review, unambiguous language in an ERISA plan must be interpreted and enforced according to its plain meaning." (citation and internal quotation marks omitted)); Williams v. Int'l Paper Co., 227 F.3d 706, 711 (6th Cir. 2000) ("When interpreting ERISA plan provisions, general principles of contract law dictate that we interpret the provisions according to their plain meaning in an ordinary and popular sense."); Salamone v. Gorman, 106 A.3d 354, 367–68 (Del. 2014) ("Delaware law adheres to the objective theory of contracts, *i.e.*, a contract's construction should be that which would be understood by an objective, reasonable third party." (citation omitted)).

This interpretation accords with Section 7.9(a) of the Partnership Agreement.  See Johnson v. Am. United Life Ins. Co., 716 F.3d 813, 820 (4th Cir. 2013) ("ERISA plans, like contracts, are to be construed as a whole." (citation omitted)); Chi. Bridge & Iron Co. N.V. v. Westinghouse Elec. Co. LLC, 166 A.3d 912, 913–14 (Del. 2017) ("In giving sensible life to a real-world contract, courts must read the specific provisions of the contract in light of the entire contract.").  As noted above, that provision states that "payment of such retirement benefits [under Article VII] shall not *begin* until the Partner experiences a separation from service[.]" BDO45 (emphasis added).  These payments are "made in equal monthly amounts," see BDO46, for the duration of the partner's lifetime (or a minimum of ten years), see BDO45.  Like the Retirement Agreement, Section 7.9(a) does not mention an "accrual" of payments prior to a partner's separation, nor does it suggest that a partner would receive a "lump sum" of deferred payments.  Here too, the reasonable interpretation of Section 7.9(a) is that the "stream of payments" flowing from Anderson's annual retirement benefit would *begin* after he left the firm in December 2023.  Def.'s Mot. at 18.

Anderson retorts that Section 7.9(a) contemplates the payment of retirement benefits following a partner's "retirement date," so the retirement date "is clearly when the condition for payment starts." Pl.'s Rebuttal in Supp. of Mot. for J. ("Pl.'s Rebuttal") at 4. The section's subsequent reference to the partner's separation from service, he says, concerns "exclusively when the timing of payments begins." Id. But this interpretation adds words to the agreement that simply are not there. Nothing in Section 7.9(a) suggests that its last clause "exclusively" concerns the timing of payments. When read as a whole, the section provides that (1) a partner would receive annual retirement benefit payments for at least ten years after the partner retires, and (2) those payments "begin" after the partner experiences a separation from service.[5] See Colby v. Union Sec. Ins. Co. & Mgmt. Co. for Merrimack Anesthesia Assocs. Long Term Disability Plan, 705 F.3d 58, 66 (1st Cir. 2013) ("The provisions of an ERISA plan must be read in a natural, commonsense way."); Cincinnati SMSA Ltd. P'ship v. Cincinnati Bell Cellular Sys. Co., 708 A.2d 989, 992 (Del. 1998) ("Delaware observes the well-established general principle that . . . it is not the proper role of a court to rewrite or supply omitted provisions to a written agreement.").

---

[5] Anderson's claim is further undermined by the Partnership Agreement's recognition of "the time value of money." Def.'s Mot. at 24 n.7. It is undisputed that the Partnership Agreement provides interest payments to partners for certain "accrued" entitlements. See, e.g., BDO41 (providing that retired partners may receive interest "on the declining balance . . . of contributed capital . . . as such capital is paid out"). However, there is no comparable provision for interest payments on "deferred" annual retirement benefit payments that, according to Anderson, "accrue" prior to a partner's separation from service. See Pl.'s Mot. at 21 n.19 (conceding that "nothing in the Partnership Agreement compensates the retired partner for the loss of use of the funds for the period of this deferral"). The fact that the Partnership Agreement does not provide for interest on "accrued" annual retirement benefit payments suggests that those payments are not "deferred" at all.

C.  Other Provisions of the Partnership Agreement

Anderson's remaining counterarguments—which largely rest on inferences drawn from other sections of the Partnership Agreement—are unpersuasive.

First, Anderson suggests that Section 7.9(a) must be read in tandem with Section 16.10. See Pl.'s Mot. at 18 (stating that Section 16.10 offers "[f]urther clarity" about Section 7.9(a)). Section 16.10 states that if BDO could not provide a benefit "at the time specified" by the Partnership Agreement "without incurring penalty sanctions or adverse tax consequences under Section 409A," then the benefit "shall be provided in full at the earliest time thereafter when such adverse tax consequences will not be imposed." BDO71. In Anderson's view, this section "clearly refers" to the annual retirement benefit payments that he says he was entitled to—but could not receive without triggering Section 409A—while he was employed by BDO. Pl.'s Mot. at 18. That is, the annual retirement benefit payments that BDO purportedly owed him between July 2019 and December 2023 could only be provided "in full" if they were "paid in a lump sum as soon as practicable after a separation from service." Id. at 18–19.

But this argument assumes that BDO did in fact owe Anderson annual retirement payments between July 2019 and December 2023. See Pl.'s Rebuttal at 5–6 (asserting that BDO was "obligated" to make "a lump sum payment covering the time between retirement and actual separation"). As explained above, it did not. Section 7.9(a) provides that payment of a partner's annual retirement benefit "shall not *begin*" until the partner "experiences a separation from service within the meaning of Section 409A[.]" BDO45 (emphasis added). The Retirement Agreement reiterates that Anderson would "*start receiving* retirement benefits *commencing* on or about the 15th of the month following [his] separation" from BDO. BDO83 (emphasis added). Since Anderson's annual retirement benefit payments would not start until *after* he experienced a

14

separation from service, Section 7.9(a) does not trigger Section 409A.  <u>See</u> 29 U.S.C.

§ 409A(a)(2)(A)(i).  Put another way, payment of annual retirement benefit under Section 7.9(a)

*can* be provided "at the time specified" by the Partnership Agreement "without incurring penalty

sanctions or adverse tax consequences under Section 409A."  BDO71.

Second, Anderson claims that if Section 16.10 does not apply to his annual retirement

benefit payments under Section 7.9(a), then Section 16.10 would be rendered superfluous.  <u>See</u>

Pl.'s Mot. at 19 ("It is a fundamental rule of construction of contracts that every provision is

relevant, and any construction that renders a provision superfluous or inapplicable is improper."

(citation omitted)).  Not so.  As an initial matter, Section 16.10 is located within Article XVI

(titled "Execution and Agreement"), not Article VII (titled "Retirement").  BDO69.  Like the rest

of Article XVI, Section 16.10 refers to the Partnership Agreement generally, not retirement

benefits specifically.  <u>See</u> BDO71 ("This Agreement shall be interpreted to comply with, and to

avoid adverse tax consequences under, Section 409A.").  More importantly, it is *Anderson's*

interpretation of Section 16.10 that would render the final clause of Section 7.9(a) superfluous.

If BDO owed annual retirement benefit payments to a partner immediately after his retirement—

even if the partner continued to be employed by the firm—then Section 16.10 would, by itself,

require the firm to pay the "accrued" benefits to the partner after his separation from service.

<u>See</u> BDO71.  There would be no need for Section 7.9(a) to reiterate that "payment of such

retirement benefits shall not begin until the Partner experiences a separation of service."

BDO45.  By contrast, BDO's interpretation gives meaning to both the final clause of Section

7.9(a) (a condition for when the stream of annual retirement benefit payments "begin[s]") and

Section 16.10 (a general provision for how the entire Agreement "shall be interpreted").[6]

Third, Anderson suggests that Section 12.11 of the Partnership Agreement "makes clear"

that BDO owed him annual retirement benefit payments immediately after he retired from the

partnership.  Pl.'s Mot. at 19.  Section 12.11 provides that "if a Partner's interest in the

Partnership terminates because of retirement, any monthly payment under Article VII, if

applicable . . . shall begin in the month following the close of the fiscal year in which the

Partner's interest terminates."  BDO57.  Since Anderson retired in the fiscal year ending in June

2019, he says, he was owed annual retirement benefits beginning in July 2019.  See Pl.'s Mot. at

19–20.  The Court agrees that Section 12.11 generally specifies the *timing* of the annual

retirement benefit payments provided by Article VII.[7]  But it does not alter Article VII's

*condition* to the annual retirement benefit payments:  "[P]ayment of such retirement benefits

shall not begin until the Partner experiences a separation from service[.]"  BDO45.  When read

---

[6] Pursuant to the Court's prior order, see Sep. 26, 2025 Min. Order, BDO has moved for leave to file a sur-rebuttal, see Def.'s Mot. for Leave to File a Sur-Rebuttal in Opp'n to Pl.'s Mot. for J. & Supp. of Cross-Mot. for J. at 1–2.  Among other things, the proposed sur-rebuttal responds to Anderson's claim that because Section 16.10 "does not appear to apply to any other sections" of the Partnership Agreement, it must apply to Section 7.9(a) "or it would be superfluous[.]"  Pl.'s Rebuttal at 6.  Because Anderson's motion for judgment only mentioned superfluity in passing, see Pl.'s Mot. at 19, the Court will grant BDO's motion for leave to file the sur-rebuttal, see Clendenny v. Architect of the Capitol, 236 F. Supp. 3d 11, 17 n.2 (D.D.C. 2017) (noting that the Court has discretion to grant leave to file a sur-reply based on whether it is helpful to the adjudication of the motion and whether the opposing party would be unduly prejudiced (citation omitted)).

[7] Curiously, BDO asserts that the relevant provision of Section 12.11 only concerns a partner's additional retirement benefit derived from their undistributed earnings account, not their annual retirement benefit.  See Def.'s Mot. at 22–23 ("Payment of the annual retirement benefit is governed exclusively by Section 7.9(a).").  But Section 12.11 refers to "*any* monthly payment under Article VII, if applicable," BDO57 (emphasis added), which naturally includes the annual retirement benefit, see BDO42.

16

together, Section 7.9(a) and Section 12.11 require BDO to start paying annual retirement benefit payments to a partner in the month after the fiscal year in which they retire, "provided that" the partner experiences a separation from service. BDO45. Since Anderson did not experience a separation from service when he retired from the partnership, his Retirement Agreement specified that he would "start receiving" annual retirement benefit payments "commencing" the month following his separation from BDO. BDO83.

Fourth, Anderson protests that "it simply does not make sense" to read the Partnership Agreement as "forfeiting" his annual retirement benefit payments until he experiences a separation of service while merely "deferring" the payment of his additional retirement benefit. Pl.'s Mot. at 22. Putting aside the fact that Anderson did not "forfeit" any benefits, it is entirely reasonable that the annual retirement benefit payments would begin upon his separation of service, and he would simultaneously receive the full value of his additional retirement benefit. The annual retirement benefit is a stream of monthly payments made for an indefinite period of time, see BDO45, while the additional retirement payment is a fixed sum equal to the partner's undistributed earnings account balance and paid in monthly installments, see BDO58–59; BDO82–83. And pursuant to the plain language of the Partnership Agreement and the Retirement Agreement, Anderson was not entitled to receive either set of benefits until he experienced a separation from service in December 2023. See BDO45; BDO82–83.

* * *

Based on its *de novo* review of the Administrative Record, the Court concludes that Anderson was not entitled to a "lump sum" of retirement benefit payments that "accrued" between July 2019 and December 2023. Accordingly, BDO did not improperly deny Anderson benefits due to him under the terms of the Plan. See BDO90; 29 U.S.C. § 1132(a)(1)(B).

17

## IV.    Conclusion

For the foregoing reasons, the Court will deny Plaintiff's Motion for Judgment, grant

Defendant's Cross-Motion for Judgment, and enter judgment in favor of Defendant.  The Court

will issue a separate order consistent with these findings of fact and conclusions of law.

CHRISTOPHER R. COOPER
United States District Judge

Date:  June 18, 2026